**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Tammy M. Hochradel, | : | Case No. 3:07 CV 1799 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security, | : | **MEMORANDUM DECISION AND ORDER** |
| Defendant. | : | |

Plaintiff seeks judicial review of a final decision of the Commissioner denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 1381 and 405(g), and for Supplemental Security Income (SSI) under Title XVI of the Act. Pending are Briefs on the Merits filed by the parties and Plaintiff's Reply (Docket Nos. 16, 19 and 20). For the reasons set forth below, the Commissioner's decision is affirmed.

**PROCEDURAL BACKGROUND**

Plaintiff applied for DIB and SSI on November 13, 2001, alleging that her disability began on March 2, 2000 (Tr. 80-82, 436-37). The applications were denied initially and on reconsideration (Tr. 65-68, 71-73, 439-442, 443-445). A hearing was held in Toledo, Ohio, on January 28, 2004, by Administrative Law Judge (ALJ) Bryan J. Bernstein (Tr. 33, 44). Plaintiff, represented by counsel, Loretta Willey, and Vocational Expert (VE) Joseph Thompson appeared and testified (Tr. 44-45). On February 22, 2006, the ALJ rendered an unfavorable decision finding that Plaintiff was not under a disability as defined under the Act (Tr. 14-28). Plaintiff requested review of the hearing decision on April 19, 2006

(Tr. 13). The Appeals Council denied Plaintiff's request for review on April 20, 2007, thereby rendering the ALJ's decision the final decision of the Commissioner (Tr. 7-9).

## JURISDICTION

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Commissioner of Social Security*, 474 F.3d 830, 832-833 (6th Cir. 2006).

## FACTUAL BACKGROUND

*Plaintiff's Testimony*

Plaintiff testified at the administrative hearing that she lived with her boyfriend until their recent break-up. She now resides alone in Toledo, Ohio (Tr. 50-51). Plaintiff had been attending counseling sessions at Unison Behavioral Center due to mental health issues following an October 2003 incident in which her then live-in boyfriend assaulted her (Tr. 51). While attending Unison, Plaintiff participated in a weekly group meeting to address depression and other mental health issues (Tr. 53). Plaintiff further testified that she sometimes felt sad and suffered from migraine headaches every two weeks (Tr. 54). Her migraine headaches were accompanied by blurry vision, sensitivity to light and dizziness. She would have to lie down to make herself feel better (Tr. 55).

Plaintiff was prescribed Ibuprofen, but when she could not afford the prescription she took over-the-counter Tylenol or Advil (Tr. 55). Plaintiff also testified that she had sporadic problems with her ankles which sometimes interfered with her ability to walk (Tr. 56).

*VE Testimony*

The VE testified that an individual of Plaintiff's age, education, past work experience and residual function capacity could perform work as a janitor, food preparer, and mail clerk. There were 1,500 janitorial jobs regionally with 12,000 statewide, 2,500 regional food preparation jobs with 40,000 statewide, and 2,000 regional mail clerk positions and 8,000 statewide (Tr. 58).

## MEDICAL EVIDENCE

Dr. Mark Young served as Plaintiff's primary care physician from at least 1998 (Tr. 187). On February 28, 2002, Dr. Young prescribed Celexa, an antidepressant, for symptoms of depression that were manifested as early as 2000 (Tr. 172). On March 28, 2002, Plaintiff told Dr. Young that she still felt depressed, and the antidepressant was not helping (Tr. 171). Dr. Young discontinued Celexa and substituted Prozac and Bextra (Tr. 170). He also referred Plaintiff to Unison Behavioral Health Group for treatment (Tr. 286).

At Unison, Michelle Reid, P.C.C., conducted an initial evaluation of Plaintiff's depression on April 10, 2002 (Tr. 250-252). Plaintiff reported that she had experienced decreased energy, crying spells, decreased sleep, loneliness, feelings of worthlessness since 2000, some difficulty concentrating and an abusive second marriage (Tr. 250-251). She reported a suicide attempt in 2000 (Tr. 250). Ms. Reid diagnosed Plaintiff with a depressive disorder and a dependent personality disorder based on Plaintiff's history. She assigned Plaintiff a score of 56 on the Global Assessment of Functioning scale (GAF), indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 252).

On June 10, 2002, Dr. Alamdar Kazmi, a psychiatrist, conducted a psychiatric evaluation of Plaintiff (Tr. 248). He diagnosed a depressive disorder and dependent personality disorder, and assigned a GAF score of 59, indicating moderate symptoms or moderate difficulty in social, occupational, or school

functioning (Tr. 249). During visits in July, August, September, and November 2002, Plaintiff reported ongoing problems in her relationship with her boyfriend (Tr. 289-291).

During September 2002, Dr. Shabana Ahmed of the Medical College of Ohio conducted a psychiatric evaluation of Plaintiff based upon her report of suicidal feelings and depression. She reported that her depression dated back to 1977, and was exacerbated by a series of physically and mentally abusive relationships and personal tragedies, including the drowning death of one of her children, and estrangement from her grown son (Tr. 197-198). She reported low energy, poor concentration, headaches, and decreased appetite (Tr. 198). Dr. Shama concluded that Plaintiff's affect was restricted; she was fully oriented; her thought processes and insight were intact; her memory was intact; her concentration within normal limits and her communications skills were good (Tr. 202-203).

Although Dr. Ahmed estimated that Plaintiff's intelligence as below average, she observed that Plaintiff displayed good abstract thinking (Tr. 202-203). She diagnosed recurrent major depression of moderate severity, and assigned Plaintiff a GAF of 45, indicating serious symptoms or any serious impairment in social, occupational, or school functioning (Tr. 203). Later, on September 26, 2002, Plaintiff again reported to Dr. Ahmed feelings of depression, hopelessness, helplessness, and suicidal thoughts (Tr. 322).

On her October 15 and November 19, 2002, visits to Dr. Ahmed Plaintiff reported feeling better but still depressed and disappointed in her children (Tr. 316-320). In January, March and April 2003, Plaintiff reported that she was feeling better, and her medication was helping (Tr. 306, 310, 314).

From November 2002 through February 2003, Plaintiff attended regular group therapy sessions at Unison (Tr. 232-247). On December 3, 2002, Plaintiff expressed concerns about her surgery scheduled on December 7, 2002, but reported a much improved mood (Tr. 245). It was noted that her dependent

personality and self esteem had improved (Tr. 243). On February 6, 2003, Ms. Anderson noted that Plaintiff seemed to have difficulty making decisions, and gave her information about Dependent Personality Disorder ( DPD) (Tr. 235). On February 17, 2003, Ms. Anderson noted that Plaintiff's mood was bright, and she was able to discuss her relationship in the context of a dependent personality (Tr. 232). On her January 13, 2003, visit to Dr. Kazmi, Plaintiff reported an improved relationship with her boyfriend and better results from her depression medication (Tr. 297).

Plaintiff went to the emergency room on October 10, 2003, with a broken nose and bruised ear, reporting that her boyfriend hit and kicked her causing injuries to her face and left ear (Tr. 253-56, 269). She was treated at St. Vincent's after reporting another assault that resulted in a ruptured spleen on July 19, 2004 (Tr. 327, 335, 341). She filed domestic violence report on December 10, 2004, following an assault by her boyfriend (Tr. 379).

On her December 15, 2004, visit to Dr. Kazmi, Plaintiff reported that her medication was working well without side effects, and also that her boyfriend again assaulted her (Tr. 398). Dr. Kazmi urged her to stay away from her boyfriend and to completely abstain from drinking (Tr. 397). During her visits on February 8 and April 5, 2005, Plaintiff reported that her medications continued to work well (Tr. 396-97). She reported that she fell and hurt her lip while drinking (Tr. 396). Dr. Kazmi recommended complete abstinence from drugs and alcohol. On July 10, 2005, Dr. Kazmi noted that Plaintiff's concentration was sufficient, her mood stable, and her thought processes organized (Tr. 414). Her condition was unchanged on August 11, August 18, August 25, August 31, September 1 and September 8, 2005 (Tr. 404-11). On September 9, 2005, Dr. Kazmi referred her for drug rehabilitation and therapy (Tr. 394).

On September 15, 2005, Plaintiff reported having overdosed with blood pressure medication after an argument with her boyfriend and continued thoughts of suicide (Tr. 402). Dr. Kazmi noted that: she

was easily distracted; her speech was fragmented; her mood depressed; and her behavior panicky (without evidence of perceptual disturbances). He concluded that she appeared to be a danger to herself (Tr. 403).

On September 16, 2005, Plaintiff was admitted to the psychiatric unit at St. Charles Mercy Hospital as a result of the overdose she had reported to Dr. Kazmi (Tr. 418-20, 428, 432-35). She was diagnosed with major depression, alcohol dependence, and dysfunctional relationships (Tr. 420). Following her discharge from the hospital on September 28, 2005,, Dr. Kazmi noted that Plaintiff had no perceptual disturbances; she was fully oriented with sufficient concentration; her mood stable; her thought processes were organized, and she was cooperative (Tr. 399)

## **CONSULTATIVE PSYCHOLOGICAL EXAMINATIONS**

On December 18, 2001, Dr. Alan White, a licensed psychologist, performed an evaluation of Plaintiff at the request of the Ohio Bureau of Disabilities Determination (BDD) (Tr. 150-155). When questioned about her prior medical history, Plaintiff reported that her recent medical history included a lymphoma on her right shoulder in 1998 and a broken ankle in 2000. She denied any life-threatening illnesses and current use of medication (Tr. 150).

Plaintiff reported the following psychological/psychiatric complaints: fatigue, recent change in appetite and eating habits, recent weight gain, feelings of worthlessness and guilt, feelings of helplessness and hopelessness, loss of interest in formerly pleasing activities, loss of interest in personal appearance or cleanliness of her home, frequent crying spells, isolation from others and short temper and snappiness with others (Tr. 151). She also reported anxiety symptoms, including generally feeling tense and uptight, forgetfulness, problems concentrating, difficulty making day-to-day decisions, frequent frustration, headaches almost daily, a preference to stay at home versus going places alone, restlessness and a general feeling of an impending tragedy (Tr. 151). Plaintiff also related a prior suicidal attempt in the past year

by cutting her wrists. She had not previously visited a counselor for nerve problems or depression although she admitted previously taking psycho tropic medications but could not recall the names (Tr. 151).

Plaintiff's normal daily routine included watching television in the mornings and evenings and walking to the store in the afternoons. She reported that she performed her daily grooming and did laundry without assistance, had an average appetite and her socialization was limited to twice monthly with family (Tr. 152)

Dr. White concluded that Plaintiff's immediate and long term memory were intact; however, her ability to deal with social situations and understanding of consequences were in the borderline range. He diagnosed major depressive disorder, recurrent, moderate and assigned her a Global Assessment of Functioning (GAF) of 58 (Tr. 154-155). In evaluating the effects of Plaintiff's psychological condition on work related activities, Dr. White further concluded that her ability to remember, sustain, concentrate, attend and follow simple directions was not impaired; her ability to get along with others was mildly impaired and her response to job-related stress would be mild to moderately impaired due to her depression (Tr. 155).

Dr. White completed a Mental Functional Capacity Assessment for the Lucas County Job and Family Services which was marked "received" on December 20, 2001 (Tr. 295). Among the areas that he rated Plaintiff as moderately limited were the following: ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, ability to work in coordination with or in proximity to others without being distracted by them, ability to make simple work-related decisions, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and the ability to maintain socially appropriate behavior and adhere to

basic standards of neatness and cleanliness.  Dr. White rated Plaintiff as markedly impaired in the category of accepting instructions and responding appropriately to criticism from supervisors (Tr. 295).  He concluded that Plaintiff was "unemployable" (Tr. 296).

Subsequently, Dr. White responded by letter to a request for clarification concerning the discrepancies in his evaluation of Plaintiff for the Bureau of Disability and for Lucas County Jobs and Family Services (Tr. 297).  Dr. White's letter stated, *inter alia*, that he was correcting an obvious discrepancy and error and that he apparently checked the wrong box on the checklist.  He referred to his report for a correct assessment of Plaintiff's level of functioning.  He explained further that the Jobs and Family Services checklist was not used by the Bureau of Disability and that in the future he would "deny all requests to place my signature on documents unless they originate directly from BDD or are requested by a court representative through BDD" (Tr. 297).

## STANDARD OF DISABILITY

DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920.  The Act requires that the Commissioner follow a "five-step sequential process" for claims of disability as

follows.

First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* [*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir.1990)].

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

Fifth, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F. 3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).

If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## ALJ'S DETERMINATIONS

Applying the appropriate disability standard, the ALJ considered the testimony presented at the hearing and the medical evidence set forth above and made the following findings:

1. The claimant met the disability insurance status requirements of the Act of March 2, 2000, the date the claimant stated she became unable to work and has acquired sufficient quarters of coverage to remain insured through September 30, 2005.

2. The claimant has not engaged in substantial gainful activity since March 2, 2000.

3. The medical evidence establishes that the claimant has depression, an impairment which is severe but which does not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant retains the residual functional capacity to perform work at all exertional levels. The claimant is not able to perform work that imposes a closely regimented pace of production and the claimant is also unable to address work that imposes intense contact with the public or strangers.

5.      The claimant is unable to perform her past relevant work as a teacher's aid, day-care worker, and nurses' aid.

6.      The claimant is 47 years old, a "younger individual age 45-49."

7.      The claimant has at least a high school education.

8.      Considering the claimant's age, educational background, and residual functional capacity, she is able to make a successful vocational adjustment to work which exists in significant numbers in the national economy.

9.      The claimant has the residual functional capacity to perform a significant range of work at all levels of exertion.

10.     Although the claimant's non-exertional limitations do not allow her to perform the full range of work, using Medical-Vocational Rule 204.00 as a framework for decision-making and the testimony of the vocational expert, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs include work as: office cleaner (1,500 in Toledo and 12,000 in Ohio), a mail clerk (2,000 in Toledo and 8,000 in Ohio), and a food prep (2,500 in Toledo and 40,000 in Ohio).

11.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C. F. R. §§ 404.1520(f) and 416.920(f)).

## **STANDARD OF REVIEW**

This Court exercises jurisdiction over the review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan, supra*, 474 F.3d at 832 -833. In reviewing claims under the Act, a district court does not review the matter *de novo.  Id.*  Instead, a district court is limited to examining the entire administrative record to determine whether the Commissioner's final decision is supported by substantial evidence.  *Brown v. Commissioner of Social Security*, 2007 WL 4556678, *5 (N. D. Ohio 2007) (*citing Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984); 5 U.S.C. § 706(2)(E); 42 U.S.C. § 405(g)).  "Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion.  *Id*. (*citing Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)). The substantial evidence standard requires more than a scintilla, but less than a preponderance of the

evidence. *Id.* To determine whether substantial evidence exists to support the Commissioner's decision, a district court must not focus, or base its decision, on a single piece of evidence. Rather, a court must consider the totality of the evidence on record. *Id.* (*citing Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v.* Mathews, 574 F.2d 359 (6th Cir. 1978)).

When dealing with conflicting evidence, a district court generally will defer to the ALJ's findings of fact. *Id*. at *6. To that end, the Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers. *Id.* It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts." *Id*. (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). Accordingly, for the Court to accept the ALJ's conclusions, it must only find that they are based on substantial evidence. *Id*.

Judicial review of the Commissioner's decisions is limited to determining whether such decision is supported by substantial evidence and whether the Commissioner employed the proper legal standards. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994) (*citing Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. (*citing Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2428 (1983)). The reviewing court may not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility. *Id*. (*citing Brainard v. Secretary of health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

In determining the existence of substantial evidence, the reviewing court must examine the

administrative record as a whole. *Id*. (*citing Kirk*, 667 F.2d at 536). If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *see Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (*citing Mullen v. Bowen*, 800 F.2d 535, 546 (6th Cir. 1986)).

## DISCUSSION

First, Plaintiff argues that the ALJ erred as a matter of law in failing to perform any analysis of Plaintiff's credibility or any assessment of her subjective symptoms. Plaintiff contends that, as stated in TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96-7P, 1996 WL 374186 (July 2, 1996), the ALJ's decision must contain specific reasons for the finding on credibility. Next Plaintiff argues that the ALJ made factual errors in relying on the opinion of a Consultative Examiner (CE) who prepared conflicting reports. Plaintiff contends that reliance on this opinion was error because the CE's report was "tainted."

### I.

Plaintiff contends that the ALJ's opinion is defective because it fails to make a credibility determination about her subjective symptoms. It is for the Secretary and not the reviewing court to make credibility findings. *Felisky, supra*, 35 F.3d at 1036. If the ALJ rejects a Plaintiff's testimony as incredible, he or she must clearly state the reasons for doing so. *Id*. A determination on credibility must also be made whenever a Plaintiff's complaints regarding symptoms or their persistence and intensity are not supported by objective medical evidence. *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 247 (6th Cir. 2007). Only if the ALJ questioned the credibility of the Plaintiff is it necessary for credibility determinations to be explicitly stated in the opinion of the ALJ.

Plaintiff does not contest the credibility findings of the ALJ in his determination of her physical impairments. The ALJ found that Plaintiff's migraines did not amount to a severe impairment because she testified that they only lasted for an hour and Ibuprofen seemed to help (Tr. 19). The subjective symptoms were not discussed by the ALJ explicitly because he accepted that Plaintiff had depression, a severe impairment (Tr. 27). This was established through the medical evidence of Dr. White and therefore no explicit determinations on credibility were necessary.

Plaintiff further contends that the ALJ's opinion was defective because it failed to evaluate her subjective symptoms associated with "dependant personality disorder." However, the ALJ recognized Plaintiff's depression as a severe impairment and therefore had to proceed through the steps in determining whether Plaintiff was disabled. Since the ALJ went through the remaining steps in his disability determination and could consider Plaintiff's "dependant personality disorder" in determining whether Plaintiff retained sufficient residual functional capacity, then it does not constitute reversible error. *Maziarz v. Secretary of Health & Human Services*, 837 F.2d 240, 244 (6th Cir. 1987).

In evaluating the psychological impact of Plaintiff's impairments on her ability to work, the ALJ determined that "the record as a whole" demonstrated that Plaintiff had no restrictions in her activities of daily living due to mental impairments, mild to moderate difficulties in social functioning, no difficulty in sustaining concentration, and had experienced no extended episodes of decompensation (Tr. 20). For this reason and because Plaintiff's credibility was not at issue, the ALJ's opinion is not defective.

**II.**

Plaintiff also contends that the ALJ erred in giving weight to the opinion of the CE, Dr. White. The ALJ admitted that there was a discrepancy between Dr. White's Bureau of Disability assessment and the Lucas County Department of Jobs and Family Services' assessment (Tr. 150-155; 295-296). The ALJ

13

contacted Dr. White to explain the inconsistency. Dr White explained that the Lucas County assessment was a mistake (Tr. 297-298). The ALJ admitted both reports into evidence, as Dr. White wrote that he inadvertently checked the wrong box on the Lucas County checklist. The ALJ also advised Plaintiff of her rights to submit written comments regarding the evidence in question, submit written questions to the author of the report, request a supplemental hearing at which she could testify, produce witnesses and request the issuance of subpoena for witnesses, including the author of the disputed report (Tr. 299). Plaintiff failed to pursue the actions suggested by the ALJ and instead requested alternatively that Dr. White's reports be stricken from the record, afforded little weight or that another consultative examination be performed (Tr. 375). Having failed to pursue the ALJ's suggested actions, Plaintiff's arguments as to what standards Dr. White applied when he wrote the reports are speculative and unpersuasive.

When there are discrepancies in the medical evidence, it is the ALJ's job to resolve inconsistencies. *Gaffney v. Bowen*, 825 F. 2d 98, 100 (6th Cir. 1987). The ALJ recognized Dr. White's examination as carrying some weight because it was generally consistent with Plaintiff's treating physicians and with Dr. Kasmi, notes and assessments (Tr. 23-24). The ALJ was entitled to accept Dr. White's consultative report and he explained his rationale for doing so. Since the ALJ followed the appropriate procedure and his decisions were based on substantive evidence, the Magistrate affirms his decision.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed.

So ordered.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:  January 26, 2009